**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

<table>
<tr><td>

Shonda R. White, Individually and as Mother
and Next Friend of Lasundra Josephine
White, a Minor, and Jasmine Kinds, a
Deceased Minor, and P.K.K., a Minor,

    Plaintiffs,

v.

City of Memphis, Tennessee;
Ontarian Malone; Marquavius
Williams; Marterrion Brisco;
and Xavier Hunt,

    Defendants.

</td><td>

**Case No. 2:25-cv-02800-SHL-TMP**

*Consolidated with*

**Case No. 2:25-cv-02799-SHL-TMP**

 

JURY TRIAL DEMANDED

</td></tr>
</table>

## THIRD AMENDED COMPLAINT

Plaintiff Shonda R. White, through her undersigned counsel, complains of the above-named Defendants as follows:

## JURISDICTION

1.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 as this case arises under the Constitution and laws of the United States.  The Court has supplemental jurisdiction over state law claims in this case pursuant to 28 U.S.C. § 1367 as those claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because one or more Defendants resides in the Western District of Tennessee.

3. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Memphis, Tennessee, which is in the Western District of Tennessee.

4. All applicable limitations on actions have been extended pursuant to the "Discovery Rule" in light of new evidence produced during the discovery phase of litigation.

## PARTIES

5. Plaintiff SHONDA R. WHITE brings this action individually and as mother and Next Friend of LASUNDRA JOSEPHINE WHITE, a minor, and JASMINE KINDS, a deceased minor. Jasmine Kinds herself was the mother of a child, P.K.K. SHONDA R. WHITE is the grandmother, legal guardian, and Next Friend of P.K.K.

6. Defendant CITY OF MEMPHIS is a political subdivision of the State of Tennessee, organized and existing under and by virtue of the laws and the Constitution of the State of Tennessee. The City of Memphis operates the Memphis Police Department.

7. Defendant ONTARIAN MALONE (Officer Malone) was, at all relevant times, employed by the City of Memphis through the MPD as a duly appointed and sworn police officer. In the events described herein, he was acting under color of state law and within the scope of his employment with the City of Memphis. He is sued in his individual capacity.

8. Defendant, MARQUAVIUS WILLIAMS (Officer Williams) was, at all relevant times, employed by the City of Memphis through the MPD as a duly appointed and sworn police officer. In the events described herein, he was acting under color of state law and within the scope of his employment with the City of Memphis. He is sued in his individual capacity.

9.    Defendant, MARTERRION BRISCO, upon information and belief, is a resident of the United Staes, the State of Tennessee, and the City of Memphis, with a current address of 3196 Southbridge Street, Memphis, Tennessee 38118.

10.    Defendant, XAVIER HUNT, upon information and belief, is a resident of the United Staes, the State of Tennessee, and the City of Memphis, with a current address of 4455 Laird Drive, Memphis, Tennessee 38141.

## FACTS

### A. Police chase, striking of Infiniti, crash, and harm.

11.    In the early morning of May 6, 2023, Lasundra Jospehine White and Jasmine Kinds were passengers in a 2013 Infiniti G37.

12.    The vehicle was owned by Defendant Xavier Hunt and being operated with his permission by Defendant Marterrion Brisco.

13.    In addition to Brisco, Kinds, and White, there were three additional passengers in the vehicle.

14.    While the Infiniti was stopped at a gas station, Defendant Marquavius Williams and Defendant Ontarian Malone were on duty in their patrol vehicle and saw the Infiniti.

15.    When the occupants of the Infiniti got into the vehicle and began to drive away, Malone and Williams began to follow them.

16.    At the time, there was no evidence or information indicating that the Infiniti or its occupants were involved in any type of crime, nor had it violated any traffic laws.

17.    Officers Williams and Malone nevertheless chose to pursue the vehicle because they believed the Infiniti and its occupants started to leave after seeing the Officers, stating that,

"it kind of looked suspicious" and they "thought the car was probably stolen since you know [Infinitis] are a common car to be stolen."

18.       The MPD squad car, driven by Williams, did not turn on any sirens, police emergency lights, or headlights on as it followed the Infiniti; a practice that Williams called being "blacked out" and said he had done on occasion to "get up on the vehicle."

19.       The Officers then engaged in a high-speed pursuit of the Infiniti through the city streets of Memphis.

20.       At no time during the pursuit did Officers Malone or Williams inform a supervisor or report the pursuit over their radio.

21.       At no time did Officer Malone or Williams activate their body worn cameras or dash cameras.

22.       At around 2:53 A.M., while pursuing the Infiniti at a high speed, the Officers struck the rear of the fleeing Infiniti.

23.       As a result of being struck by the Officers' vehicle, the Infiniti lost control.

24.       After losing control, the Infiniti crossed the roadway's center line, and collided with a vehicle traveling in the opposite direction.

25.       After striking the other vehicle, the Infiniti careened off the road and struck a chain link fence, metal awning, and brick building.

26.       Upon striking the building, the Infiniti burst into flames.

27.       The driver, Marterrion Brisco, the front seat passenger, and one other individual in the backseat of the vehicle were able to free themselves and flee the scene.

28.       Another passenger was ejected from the sunroof of the vehicle and thrown onto the brick wall of the building that was struck.

29.     Lasundra White was able to free herself and escape the vehicle but was seriously injured and sustained severe burns all over her body.

30.     Jasmine Kinds was trapped inside the vehicle as it was engulfed in flames. She burned to death.  She was pronounced dead at the scene.

**B.  Injuries and damages.**

31.     As a direct and proximate result of one, some, or all of the of the aforesaid acts and omissions, Lasundra White suffered and will continue to suffer injuries and damages including but not limited to:

    a.   Severe and permanent personal injuries and damages, including but not limited to second-degree burns on the right side of her body, scarring and disfigurement, and injuries to her body as a whole, and trauma;

    b.   Temporary/permanent impairment to the body as a whole as a result of multiple injuries;

    c.   Pain and physical suffering;

    d.   Hedonic damages, including loss of enjoyment of life, both past and future;

    e.   Fright and shock;

    f.   Mental anguish;

    g.   Out of pocket expenses;

    h.   Medical expenses;

    i.   Loss of earning capacity.

32.     As a direct and proximate result of one, some, or all of the of the aforesaid acts and omissions, Jasmine Kinds, deceased minor, suffered injuries and damages including but not limited to:

    a.   Severe fatal personal injuries and damages to her body as a whole;

b. Pain and physical suffering prior to her death;

c. Hedonic damages, including loss of enjoyment of life, both past and future;

d. Fright and shock;

e. Mental anguish;

f. Medical expenses;

g. Death;

h. Funeral expenses.

33.     As a direct and proximate result of one, some, or all of the of the aforesaid acts and omissions, Plaintiff Shonda White suffered and will continue to suffer injuries and damages including but not limited to:

a. Loss of love, support, society, and affection of Lasundra White;

b. Loss of love, support, society, and affection of Jasmine Kinds;

c. Medical expenses of Lasundra White;

d. Medical expenses of Jasmine Kinds;

e. Funeral expenses of Jasmine Kinds.

34.     As a direct and proximate result of one, some, or all of the of the aforesaid acts and omissions, the child of Jasmine Kinds, P.K.K., has suffered and will continue to suffer damages including but not limited to the loss of love, support, society, guidance, and affection of Jasmine Kinds.

**C. The City of Memphis has a settled custom of using excessive force against individuals who flee or otherwise inconvenience or annoy the police.**

35.     Within the Memphis Police Department there exists a well-established, widely recognized custom under which officers routinely employ unjustified and excessive force against

individuals who flee from them or who otherwise, anger, annoy, embarrass, or otherwise inconvenience them.

36.     This custom is widely referred to within the MPD and among officers as imposing a "tax" on civilians who flee from officers, resist arrest, or otherwise anger, inconvenience, or embarrass MPD officers.

37.     In engaging in this violence, which is also referred within the MPD as a "run tax," officers beat, strike, and otherwise inflict physical harm and suffering on civilians for no reasonable law enforcement purpose.

38.     The "tax" culture is commonly associated with direct, personal violence inflicted with kicks, punches, and the like.

39.     The foregoing practices have been ingrained into the culture and policy of the MPD, as officers consistently display a disregard for the legal and ethical standards which they are expected to carry out their duties.

40.     These policies and practices are evidenced by multiple instances where MPD officers used excessive force in situations where it was not warranted, as a means of punishing civilians.

41.     The following are examples of such incidents:

    a.  On January 7, 2023, Tyre Nichols was beaten and killed by a group of MPD officers following a traffic stop. He was stopped by the officers without probable cause and complied with all commands, but the officers continued to threaten him with violence, eventually pulling him from his car, pepper-spraying him, and deploying their tasers. Fearing for his life, Tyre ran. As he fled, one of the officers involved watched the others chase Tyre, and was

recording saying, "I hope they stomp his ass." When officers caught up to Tyre, they held his arms down and punched, shoved, kicked, and beat him as he cried out for his mother. Afterwards, as Tyre was handcuffed, limp, and propped up against the side of the squad car, the officers stood around him laughing, making jokes about the beating and taking photos of him. Three days later, Tyre died of his injuries.

b.  On January 6, 2023, Deangelo Lauderdale was standing outside a gas station when three MPD officers arrived in the parking lot. The officers allegedly suspected Mr. Lauderdale of being involved in a drug transaction. When aggressively confronted and questioned by the officers, Mr. Lauderdale became fearful and fled on foot. Once the officers apprehended and restrained him, they proceeded to beat, pepper-spray, and kick him in the face.

c.  On December 16, 2022, Jaylin McKenzie was shot and killed as he ran away from MPD officers. Officers had observed Mr. McKenzie run a red light and a vehicle chase ensued. Eventually, Mr. McKenzie's vehicle stopped, and he got out and fled on foot. The officer pursuing Mr. McKenzie, who had turned off his body worn camera, shot and killed him as he ran.

d.  On December 1, 2022, Labrayant Burnside and two other minors were in a vehicle that MPD officers suspected of being stolen and attempted to stop. When the vehicle pulled over, the minors including Labrayant got out on foot and ran. Labrayant was caught by one of the MPD officers and restrained. While he was handcuffed on the ground, an officer placed the muzzle of his MPD issued AR15 to the back of Labrayant's head and stated, "if you move, I

will blow your fucking head off." Later while being transported to jail, MPD officers stopped the vehicle in a parking lot. One of the officers got out of the car and went into the back seat where Labrayant was sitting handcuffed, and smacked him. When Labrayant arrived at the booking station, another MPD officer slapped him in the face as he was getting his photo taken.

e.  On November 26, 2022, Marcus Bills was arrested by MPD officers at a traffic stop. He managed to slip his handcuffs and run, but officers chased and eventually tackled him. While restrained, one officer punched Mr. Bills in the back. Another officer then punched him in the face while the others turned themselves around to avoid capturing the force on their body worn cameras.

f.  On October 1, 2022, Maruice Chalmers-Stokes was leaving a barbershop and walking down the street when he noticed a vehicle containing people in ski-masks following him aggressively. Fearful, he began to run. Unbeknownst to him, the vehicle was an unmarked MPD squad car, containing MPD officers. The officers proceeded to strike Mr. Chalmers-Stokes with their vehicle as he ran. Mr. Chalmers-Stokes was able to get up and continue running, but officers jumped out of the vehicle and tackled him, causing him to hit his head on a brick and incur serious injuries. The officers involved later claimed that they began to follow Mr. Chalmers-Stokes simply because he was walking in the street.

g.  On May 22, 2022, Davitus Collier was one of three men in a vehicle stopped by MPD officers for an alleged seat belt violation. Upon approaching the vehicle, an officer told Mr. Collier that there was a warrant connected to the

car. Mr. Collier informed the officer that the car belonged to his father, but the officer escalated the interaction and began to pull Mr. Collier from the car. Out of fear, Mr. Collier began to run towards a nearby store where he knew there would be witnesses. While running, Mr. Collier fell and the officer tackled him. The officer proceeded to repeatedly pepper-spray my Collier while yelling at him to stop resisting. However, video footage of the incident revealed that Mr. Collier was in fact not resisting and was restrained while the officer sprayed him.

h.  On January 16, 2021, Marco Lockett was in a vehicle being pursued by MPD officers who suspected that it was stolen. Mr. Lockett got out of the vehicle and fled on foot. An officer chased and eventually found Mr. Lockett hiding in a shed nearby. Upon finding him, the officer struck Mr. Lockett in the head with his MPD issued pistol. Once Mr. Lockett was handcuffed, the officer punched him in the face three times.

i.  On July 17, 2015, Darrius Stewart was in a vehicle with two others when they were pulled over by MPD officers. Upon learning that there were three outstanding warrants for Mr. Stewart, the officer attempted to arrest him, but Mr. Stewart began to flee on foot. The officer responded by shooting Mr. Stewart three times as he ran and while his back was turned to the officer. Mr. Stewart died of his injuries.

j.  On April 2, 2015, Daniel Jefferson Jr. was followed by an MPD Organized Crime Unit Officer in an unmarked car. Mr. Jefferson was unaware that the individual following him was a law enforcement officer and began to fear for

his life. Upon being confronted, Mr. Jefferson shot at the officer in what he believed to be self-defense. Mr. Jefferson was subsequently arrested and taken to an MPD precinct. Once inside, officers immediately started hitting Mr. Jefferson in his ribs and back. A supervisor was heard telling officers "don't do it out here" and instructing them to take Mr. Jefferson to the bathroom instead. Mr. Jefferson was taken to a recreation room where more officers, who, upon hearing that Mr. Jefferson was the individual who shot a fellow officer, joined in beating him. He was kicked, punched, and body-slammed by officers while restrained in handcuffs.

42.     In December of 2024, the DOJ published a report of their findings from an investigation into the MPD. They found that MPD officers frequently escalated encounters involving low-level offenses and traffic offenses, leading to unreasonable uses of force. They also concluded that during many encounters, officers appear to punish people who try to get away with physical violence.

43.     The following incidents were identified by the DOJ during their investigation to illustrate these practices:

a.  In one incident, officers responded to an unarmed, mentally ill man who tried to take a $2 soft drink from a gas station. The man left the drink and exited the store. An officer followed him as he walked away through the parking lot, yelling at him to leave. As other MPD patrol cars arrived, the man put his arms up in the air and the officer, without warning, grabbed him and shoved him against a squad car. Another officer kneed the man in the side four times, pulled him to the ground, pressed his forearm into his neck, and struck the

man. The man screamed and tried to run away. Officers responded by firing a taser at him, then placing him in a chokehold and firing the taser at him four more times, including once while he was face down with his hands secured behind his back.

b.  In another incident, MPD stopped a vehicle for a tag violation and determined that one of the passengers in the vehicle had a misdemeanor warrant. The passenger ran and the officers pursed him. Once the officers caught up to the man, he appeared to surrender. Despite this, the officer punched the man in the face, wrapped his arms around his neck, and tackled him. The officer pressed the man's face and neck into the ground while another officer knelt on his back.

c.  In another incident, officers observed a woman speeding and confronted her after she had parked and was standing on the porch of a relative's home. The officers demanded her ID, and when she did not produce it, they told her she was going to jail. She stepped away from officers and told them that they were not welcome on the property. The officers responded by roughly grabbing, handcuffing, shoving her against a wall. They threatened to pepper spray her and slam her to the ground. After the woman was placed in the squad car, one officer asked the other "so what did we see her do?" The officer suggested that she had tinted windows, and the other officer replied, "all this for a tint?" In response, the officer shook his head and gestured with his hand that the woman had talked too much.

d. In another incident, MPD officers offered to give a mentally ill man a ride home from a gas station. Once the man was in the car, they discovered that he had a misdemeanor warrant. They pulled him from the car to arrest him and threatened to beat him. When the man tried to run away, the officers repeatedly punched him in the head and body, then wrapped an arm around his neck to pull him to the ground and pressed his head and neck into the pavement.

e. In another incident, two boys, aged 15 and 16, ran from an officer who attempted to cite them for a curfew violation. The officer ran after them and eventually caught up to them. Angry that they attempted to flee and worried he may have dropped something while running, the officer said "I am fucking these little kids up, man… I am fucking you all up, I just wanted to let y'all know that."

### D. The City of Memphis extends its customs regarding civilians who flee to police pursuits.

44. The violent and retributive cultural practices described above extend to police car chases.

45. Civilian drivers who fail to stop or otherwise flee frequently become the subject of dangerous, unlawful vehicle pursuits.

46. Officers engage in such pursuits regardless of whether the individual being pursued is suspected of or known to have committed a crime, and individuals suspected of nonviolent, misdemeanor offenses are often pursued.

47.     Officers use their vehicles to force suspects off the road, including by employing a Precision Immobilization Technique (PIT maneuver) in which they intentionally strike the rear of a fleeing vehicle to cause it to lose control.

48.     These dangerous pursuits have little law enforcement purpose except to capture the person because of the fact that they fled, all the while placing the occupants of the fleeing vehicle, and surrounding motorists and pedestrians, in severe and unnecessary danger.

49.     The following are examples of such pursuits:

    a.  On April 4, 2021, MPD officers were notified about a group of individuals driving ATVs and breaking traffic laws. As officers arrived in the area, the riders began to disperse. Among this group were Justin Griham and Emmanuel Meniru. Both men attempted to flee and were pursued by MPD officers in their squad cars. One of the men was seen driving his vehicle through a grassy area on the side of the road when an MPD officer abruptly veered off the roadway, taking a sharp right turn and striking the ATV and its rider, nearly landing on top of him with the squad car. Another MPD officer struck the other rider with his vehicle after driving against traffic on the wrong side of the road in pursuit of the rider.[1]

---

[1]  This incident was covered in the local press.  *See, e.g.*,, "Excessive is an Understatement: Reaction to Video of Memphis Officer Chasing & Hitting ATV Driver," LocalMemphis.com (I-Team), Apr. 5, 2021, https://www.localmemphis.com/article/news/investigations/i-team/video-of-memphis-officer-chasing-hitting-atv-driver/522-66c07d14-1daa-4430-bd4a-d1f6beb91f3b; Video Shows Memphis Police Cruiser Clip ATV, Get Stuck on Pole, *Commercial Appeal* (Apr. 5, 2021), https://www.commercialappeal.com/story/news/2021/04/05/video-shows-memphis-police-cruiser-clip-atv-get-stuck-pole/7096290002/;.  It was also the subject of a lawsuit against the City of Memphis *see Jaico v. City of Memphis*, 2:21-cv-02506-MSN-CGC, ECF 1 (W.D. Tenn.).  That lawsuit alleged that the City sanctioned customs and practices pursuant to which MPD Officers broadly used excessive force to carry out arrests, including in vehicle pursuits. *See id.* ¶¶ 130-141.

b. On June 4, 2005, pursued a suspect in a high-speed chase through the parking lot of a store. The suspects' car crashed into the store and struck several people inside. A suit was brought against MPD by injured victims and parents of minor victims. At least six people were injured as a result, suffering broken limbs, fractured vertebrae, cuts, bruises and similar injuries.[2]

c. On July 13, 2023, MPD officers pursued fleeing suspect at high speeds, with the result that the suspect crashed into two other cars in an intersection and two people were killed. Witness saw a MPD squad car chasing the car that caused the crash with just their lights, no siren.

d. On November 21, 2023, MPD officers chased a vehicle MPD officers chasing vehicle, ended in multiple car collision when the vehicle being pursued hit two others in an intersection. The driver died and another driver was injured.[3]

e. On November 7, 2024, An MPD chase ended in a crash that killed three people and injured five others after the car being chased ran into a pole. With witnesses reporting that the crash occurred after an MPD squad car rammed the fleeing vehicle.

50. Indeed, chase figures indicate that MPD police engage in chases even though they present considerable danger. For example, In 2020, there were 64 pursuits, and 39 accidents

---

[2] This incident was the subject of a lawsuit against the City of Memphis. *See Jones v. City of Memphis*, No. 06-2340 BP,(W.D. Tenn. Aug. 4, 2007).

[3] This incident was covered in the local press. *See* https://wreg.com/news/local/critical-crash-shuts-down-hickory-hill-intersection/

were related to those pursuits. In 2021, the number of pursuits jumped to 134. Accidents related to those pursuits increased as well to 57.[4]

    51.       Defendant Officers Williams and Malone personally have a documented and known history of engaging in reckless vehicle pursuits of fleeing suspects while at the MPD, prior to the pursuit on May 6, 2023:

        a.   In June of 2022, Defendant Williams was involved in a vehicle pursuit which ended in a fatal crash. Williams was in an unmarked squad car and only engaged his lights or sirens once when going through a red light. He otherwise remained in non-emergency mode throughout the pursuit, traveling 60 or more miles per hour through areas with a 25 to 35 mile per hour speed limit. At one point, Williams intentionally hit the back of the vehicle he was pursuing, causing the rear bumper to drag on the ground as he proceeded to chase it for four more miles. The pursuit ended when the vehicle being chased crashed into another vehicle on the road, killing one of the occupants in the car.

        b.   On December 20 of 2022, Defendant Williams was engaged in two separate pursuits. He was cited for violations of the MPD's pursuit policy for both. During the first pursuit, Defendant Williams drove up to 132 miles per hour in areas with speed limits ranging from 35 to 65 miles per hour. He drove the vehicle through a store parking lot and against traffic in oncoming lanes. He also drove on the shoulder of the interstate without activating his sirens or

---

[4] These figures were reported in the local press. *See* https://www.actionnews5.com/2023/07/14/mpd-pursuit-policy-raises-questions-about-deadly-crash/

lights. In the second pursuit, Williams was seen by another officer while passing by on the shoulder of the road, travelling upwards of 100 miles per hour.  Williams received only a written reprimand for one of the pursuits; for the second pursuit, Williams was not cited until months after the May 6 pursuit.

    c. On February 9, 2023, Defendant Malone engaged in a high-speed pursuit of a vehicle without activating his emergency lights or sirens, and without notifying his supervisor.

    d. In December of 2022, Defendant Malone was involved in a vehicle pursuit that did not involve a violent fleeing felon, where he reached speeds of 129 miles per hour. He was reported to have been driving on the shoulder of the road without his emergency lights and sirens activated.

52.    The foregoing events all occurred before the May 2023 chase of the Infiniti at issue in this case, yet both Malone and Williams were allowed to remain on the force, and felt emboldened to engage in a violent chase for no legitimate law enforcement purpose except to punish the occupants of the Infiniti for fleeing from them.

**E.  The "tax" culture within MPD, including unreasonably dangerous police pursuits, was enabled by a code of silence and supervisory indifference.**

53.    The foregoing customs of excessive force and unnecessary violence directed at civilians who attempted to flee or otherwise annoy the police were enabled by a code of silence within the MPD.

54.    This code of silence included manipulation of evidence, including the capture of video evidence designed to create an accurate record of police encounters with civilians in order to ensure accountability for unlawful conduct.

55.     Time and again officers lie, manipulate or fail to record video evidence, fail to report uses of force or similar encounters, or report those encounters inaccurately.

56.     This conduct, which appears repeatedly in the examples cited above, fosters an environment where MPD officers engage in unnecessarily dangerous and violent conduct towards civilians as a matter of routine.

57.     The custom of using excessive force against those fleeing or annoying the police, including in the form of police pursuits, has been allowed to flourish within the MPD because of the MPD's policies and practices of Defendants, MPD, City of Memphis, and MPD policymakers and supervisors, who permitted and tacitly endorsed such activity.

58.     At all relevant times, the City of Memphis and the Memphis Police Department were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures involving officers conduct in carrying out their employment duties.

59.     Despite this obligation and notice of frequent policy violations and violations of citizens' constitutional rights, Defendants failed to take any reasonable steps to correct systematic deficiencies or make any significant changes to their policies, practices, and customs.

60.     Specifically, by failing adequately to supervise, discipline, and monitor officers, policymakers and supervisors implicitly ratified and condoned officers' use of excessive force and the custom of a run tax.

61.     The 2024 DOJ report on the Memphis Police Department concluded that the widespread use of excessive force by MPD officers stemmed from ineffective policies, inadequate training and supervision, and a systematic failure of leadership to hold officers accountable for their misconduct.

62.     The DOJ also found that MPD supervisors routinely failed to identify, investigate, or discipline officers for misconduct, allowing uses of excessive force and related misconduct to persist.

63.     Specifically, the DOJ found that:

a.  Despite the basic legal requirement that an officer's use of force must be proportionate in light of the severity of the offense and threat to officers, MPD policy suggested that force may be used if an individual's non-compliance prevents an officer from accomplishing their duties in a timely manner.

b.   MPD training primes officers to believe that force is the most likely way to end an encounter, citing one training that instructs officers, "if a fight is unavoidable, hurt them first and hurt them bad," again disregarding the requirement that officers only use force that is reasonable and proportional to the circumstances.

c.  Supervisors who make initial determinations about whether uses of force are reasonable and comply with MPD policy do not adequately review the incidents, often doing a cursory review and endorsing conduct without any discussion of the facts.

d.  Even when unlawful conduct is brought to attention, MPD fails to fault officers for their actions. The report cites a run tax incident to illustrate this conclusion, describing an instance where an officer fired his gun at a vehicle at a busy gas station when the vehicle attempted to drive away from him. The officer had told internal affairs that the vehicle was coming towards him and he feared for his life, but his body worn camera clearly showed the officer

firing at the vehicle as it attempted to flee, driving away from the officer as he stood behind it and fired several shots. Despite this, the final investigative report claimed that the car was driving at the officer, and he faced no discipline.

    e.   MPD provides minimal supervision of officer conduct during civilian encounters, and supervisors rarely review stops or examine the basis for citations. When community members complain to MPD, reviewers often do not identify or discipline officers for problematic stops, searches, detentions, and arrests. However, officers are subject to discipline for failing to meet productivity metrics, including a certain number of stops, citations, and arrests they are expected to conduct during their shifts. As a result, officers make stops without regard for whether reasonable suspicion exists to justify a stop.

    f.   The report concluded that MPD's supervisors ignored or excused obvious legal violations by officers, overlooked plainly excessive force, failed to meaningfully review traffic stops to ensure they are lawful, and failed to ensure that officers follow departmental policies.

64.     These systematic deficiencies in MPD training, supervision, and officer discipline have generated an environment where the use of excessive force and dangerous conduct is tolerated, concealed, and ultimately embedded within the culture and practices of the MPD.

65.     The practice of imposing a "tax" on civilians emerged from this culture, which normalized and encourage the use of dangerous conduct and excessive force and punishment of civilians who flee or disregard officer commands.

66.     MPD supervisors and policy makers were aware of these prior incidents and the culture of violence perpetrated by officers against citizens yet failed to correct systematic deficiencies or make any significant changes to the policies, practices, or customs of the MPD.

67.     These policies, practices, and customs were the driving force behind Officers Williams' and Officer Malone's unconstitutional vehicle pursuit and use of excessive force which caused the pursuit and crash of the Infiniti on May 6, 2023, and the resulting harm to Lasundra White, Jasmine Kinds, Shonda White, and P.K.K. described in this complaint.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 – Excessive Force (4th Amendment)
*Defendants Malone and Williams*

68.     Paragraphs 1-67 of this complaint are incorporated by reference as if fully set forth here.

69.     Defendants Malone and Williams intentionally struck the Infiniti they were pursuing, causing it to crash.

70.     In striking the Infiniti, Defendants Malone and Williams used unreasonable force against the occupants of the Infiniti they were pursuing, causing it to crash.

71.     Defendants Malone and Williams failed to intervene in order to prevent each other from using excessive force against the occupants of the Infiniti they were pursuing, causing it to crash.

72.     As a proximate result of these acts and omissions, Lasundra White, Jasmine Kinds, Shonda White, and P.K.K. were harmed.

**COUNT II**
**42 U.S.C. § 1983 – *Monell* Liability**
*Defendant City of Memphis*

73.     Paragraphs 1-72 of this complaint are incorporated by reference as if fully set forth here.

74.     At the time of the events described in this complaint, the City of Memphis had customs within the Memphis Police Department of excessive force, punishment of fleeing civilians, dangerous chase practices, inadequate training, coverup, and lax discipline, that was persistent and widespread, to which policy-making officials were indifferent.

75.     The foregoing customs were a driving force and proximate cause of the excessive force used against the occupants of the Infiniti.

76.     As a proximate result of these acts and omissions, Lasundra White, Jasmine Kinds, Shonda White, and P.K.K. were harmed.

**COUNT III**
**Defendant Marterrion Brisco**

77.     Paragraphs 1-34 of this complaint are incorporated by reference as if fully set forth here.

78.     In fleeing from the police at a high rate of speed, Defendant Marterrion Brisco operated the Infiniti negligently and recklessly.

79.     Brisco's negligent and reckless operation of the Infiniti was a proximate cause of the crash.

80.     As a proximate result of the crash, Lasundra White, Jasmine Kinds, Shonda White, and P.K.K. were harmed.

## COUNT IV
## Defendant Xavier Hunt

81.     Paragraphs 1-34 and 77-80 of this complaint are incorporated by reference as if fully set forth here.

82.     Defendant Xavier Hunt was the registered owner of the Infiniti operated by Mr. Brisco on May 6, 2023.

83.     Defendant Hunt is vicariously liable for the reckless and negligent acts and omissions of Mr. Brisco alleged herein, pursuant to the doctrines of negligent entrustment, permissive user, master/servant, agency, and/or family purpose.

## COUNT V
## Defendant Ontarian Malone

84.     Paragraphs 1-34 of this complaint are incorporated by reference as if fully set forth here.

85.     In chasing the Infiniti at a high rate of speed, Defendant Ontarian Malone operated the police vehicle negligently and recklessly.

86.     Defendant Ontarian Malone's negligent and reckless operation of the police vehicle was the proximate cause of the crash of the Infiniti.

87.     As a proximate result of the crash, Lasundra White, Jasmine Kinds, Shonda White, and P.K.K. were harmed.

## COUNT VI
## Defendant Marquavius Williams

88.     Paragraphs 1-34 of this complaint are incorporated by reference as if fully set forth here.

89.     In chasing the Infiniti at a high rate of speed, Defendant Marquavius Williams operated the police vehicle negligently and recklessly.

90.     Defendant Marquavius Williams's negligent and reckless operation of the police vehicle was the proximate cause of the crash of the Infiniti.

91.     As a proximate result of the crash, Lasundra White, Jasmine Kinds, Shonda White, and P.K.K. were harmed.

## COUNT VII
### Negligence (Tenn. Gov't. Tort Liability Act)
### City of Memphis

92.     Paragraphs 1-67 and 84-91 of this complaint are incorporated by reference as if fully set forth here.

93.     The negligent and reckless operation of the MPD police vehicle operated by Officers Malone and Williams on May 6, 2023 caused the Infiniti to crash.

94.     As a proximate result of these acts and omissions, to Lasundra White, Jasmine Kinds, Shonda White, and P.K.K. were harmed.

95.     The City of Memphis is vicariously liable for harm caused by the foregoing acts of Officers Malone and Williams.

WHEREFORE, SHONDA R. WHITE respectfully requests that the Court enter judgment in her favor against defendants CITY OF MEMPHIS, ONTARIAN MALONE; MARQUAVIUS WILLIAMS; MARTERRION BRISCO; and XAVIER HUNT, and award compensatory damages, damages sounding in wrongful death, punitive damages against defendants other than the CITY OF MEMPHS, costs, attorney's fees, and any other relief the Court deems just and appropriate with respect to all parties.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: December 10, 2025                           Respectfully submitted,

/s/ *Stephen H. Weil*
Joshua M. Levin* (Ill. Bar No. 6320993)
Stephen H. Weil* (Ill. Bar No. 6291026)
ROMANUCCI & BLANDIN, LLC
321 N. Clark St., Ste. 900
Chicago, IL 60654
P: (312) 458-1000
jlevin@rblaw.net
sweil@rblaw.net

Henry W. Miller, III (#016817)
Michael W. Miller (#11612)
Henry W. Miller, IV (#036533)
2400 Poplar Avenue, Suite 418
Memphis, TN 38112
901-327-3434 (Office)
mlfhenry@bellsouth.net
mlfmichael@bellsouth.net
mlfhenryjr@gmail.com

***Attorneys for Plaintiff***

* Admitted *pro hac vice*